Filed 10/14/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BYRON SILIM SUMAGANG,<br><br>    Defendant and Appellant. | H044023<br>(Monterey County<br>Super. Ct. No. SS143024)<br><br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |

The Attorney General's petition for rehearing is denied as moot. The court orders that the opinion filed September 29, 2021, be modified as follows:

The first sentence of the first full paragraph on page 19 of the opinion shall be deleted and replaced with the following: "The record does not hold substantial evidence to show the prosecution carried its burden."

There is no change in the judgment.

_____
    Greenwood, P. J.


_____          _____
    Elia, J.                                              Danner, J.

Filed 9/29/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYRON SILIM SUMAGANG,<br><br>    Defendant and Appellant. | H044023<br>(Monterey County<br>Super. Ct. No. SS143024) |

This case concerns the admissibility of statements the defendant made as the result of a two-part interrogation. The detective who questioned the defendant withheld *Miranda* warnings, elicited a complete confession, and then re-interrogated him about the same facts after warning him under *Miranda*. In both the prewarning and postwarning parts of the interrogation, defendant Byron Silim Sumagang confessed that he killed his girlfriend as part of a botched double-suicide attempt. After the postwarning statements were admitted at trial, the jury found him guilty of first degree murder. The trial court imposed a term of 25 years to life in state prison.

Sumagang contends the trial court erred by denying his motion to exclude the confession under *Missouri v. Seibert* (2004) 542 U.S. 600, 608 (*Seibert*). We hold that the trial court did so err, and we find Sumagang was prejudiced by the admission of the confession at trial. We will reverse the judgment of conviction.[1]

---

[1] Sumagang raises other claims as set forth in section II.B., but we do not reach those claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The police found Sumagang asleep in the back of a car in a remote rural area. Carole Sangco's deceased body was lying on top of him. The police took Sumagang into custody and a detective subsequently interviewed him in two stages—first without warning him under *Miranda*, and then again after warning him. In both parts of the interview, he admitted choking Sangco until she stopped breathing or moving. He claimed she had asked him to kill her, and he said he had intended to kill himself as well. Sangco, who was 20 years old, suffered from depression and had previously expressed suicidal thoughts. Toxicology tests showed she had a "potentially toxic" level of drugs in her body at the time of death.

The prosecution charged Sumagang with the willful, deliberate, and premeditated murder of Sangco. (Pen. Code, § 187, subd. (a).) The jury found him guilty as charged. The trial court sentenced him to a term of 25 years to life in state prison.

The jury heard the following evidence:

### A. *Discovery of the Car*

On the morning of November 30, 2014, the police responded to a hang-up 911 call from a remote rural area in Monterey County. A sheriff's deputy found a car with the hood up, a large crack in the front windshield, and the cap to the gas tank hanging open. Sumagang and Sangco were in the back seat and appeared to be asleep. Sangco was lying on top of Sumagang with her face "up in the window." She had a cut and some dried blood above her right eye. When the deputy knocked on the window, Sumagang woke up but Sangco did not.

Sumagang got out of the car, whereupon the deputy handcuffed him, searched him and put him in her patrol car. Sumagang, who was upset and crying, told the deputy that Sangco was his girlfriend, and he said they had both "taken a bunch of Klonopin and drank as much tequila as they could" the previous evening. The deputy testified that Sumagang told her he was "not supposed to wake up," and he was "supposed to be with

2

the female." Later, when the deputy escorted Sumagang to an ambulance, he stated he "did this to her," referring to Sangco. Another officer testified that when he asked Sumagang how Sangco received injuries to her face, he replied, "I did that to her."

Investigators found numerous items in and around the car. A bottle of tequila was found on the ground in front of the car, and a package of cigarettes had been stuffed into the engine. There was a knife wedged behind the backseat of the car, and another knife was found on the ground (possibly after the deputy removed it from the car). A partially burned piece of paper had been stuffed into the neck of the gas tank. A shoeprint was found near the crack in the front windshield.

### B. Postwarning Confession

Police interrogated Sumagang about two days after taking him into custody. The postwarning portion of the interrogation was recorded on video, which the prosecution showed to the jury.

Sumagang said he and Sangco had been together for five years. Sangco had "depression problems" and had "always been a cutter." She "just hated breathing" and "didn't wanna be a part of this shitty ass world." On the night of her death, they drove to the remote location while drinking a bottle of tequila. Sangco was using a small pocketknife to cut her wrists. Sumagang also tried to use a knife to cut his own wrists and neck.

At some point after they parked, Sumagang tried to set the car on fire by putting a pair of boxers soaked in tequila into the engine oil. He hit his head on the windshield during a tantrum, and probably broke the windshield by kicking it.

During a break in the interview, while Sumagang was alone, he began crying and said, "I'm so sorry, Carole. It was supposed to be us together. [. . .] I'm so sorry. [. . .] I just wanna die."

When the officer asked how Sangco got the injuries to her head, Sumagang said he "[p]robably head-butted her" at the same time he had his "hands on" her. Sumagang said

he thought he hit her twice. When the officer asked him to explain what he did, Sumagang replied, "I didn't want . . . even want to. Then she just kept on telling me to. Then I said, 'Fine, I'll . . .' I just wanted to die together. I didn't wanna hurt her. But then she wanted that. And then so I gave it to her." According to Sumagang, Sangco told him, " 'Please, give it to me. Don't stop.' " At some point, she closed her eyes, her arms went limp, and she "just stopped moving." He tried to pick her up, but she was already dead, so he just put her in his lap. Sumagang added, "But then . . . I forgot to kill myself, too, because . . . . [. . .] I forgot to kill myself. I was supposed to . . . ."

### C. Autopsy Results and Cause of Death

Dr. Venus Azar, a forensic pathologist, autopsied Sangco's body. Outside the presence of the jury, Dr. Azar testified that prior to forming her conclusions about the cause of death, she was "informed thoroughly" by the coroner's detectives about Sumagang's statements, and she watched part of a video of the detective's interview. Specifically, Dr. Azar was told Sumagang head-butted Sangco, used his hands to squeeze her neck, and put his hands over her nose and mouth until she stopped breathing. When Dr. Azar was asked how she used this information in forming her conclusion, she testified that she used the information to see if it fit with the injuries she had observed in her examination, but she also testified that the information did not change her conclusion or any of her physical findings.

In the presence of the jury, Dr. Azar testified that she observed multiple external injuries to Sangco's body, including a bruise on the side of her head above her left ear; petechiae (dot-like hemorrhages) on her face, in her eyes, above her upper lip, and on her left ear; a laceration on her right eyebrow; a bruise with a slight abrasion on her lower lip; about seven abrasions or scratches to her neck and under her chin; some minor abrasions on her wrists and legs; and a half-inch bruise on her tongue. The external injuries were the result of blunt force trauma. Sangco also had a postmortem tooth impression on her lower lip, but it could not have been caused by the medics.

4

Dr. Azar testified that she saw "quite a bit of dot-like hemorrhages, we call petechiae, on the face, and in [Sangco's] eyes, around her eyes, and on her eyes and in her mouth and on her left ear," as well as above her upper lip. Dr. Azar explained that "petechiae are dot-punctate hemorrhages. [I]t's a disease process that people can have if they're dying from multiple things, such as severe burns, or severe infections/or sepsis. They can develop a process from damage to their blood vessels that is called diffused intervascular coagulation[]." She then testified that "we all see petechiae in strangulation" and "in other cases such as blunt-chest trauma or compressions, severe compression of the chest, because [] what the strangulation and the hanging or severe blunt-chest trauma have in common is they block egress or outflow of blood draining from the neck, and either by pressure on the neck from hanging or strangulation, or from severe pressure to the chest, in severe blunt trauma or compression of the chest, and that raises the pressure in the head and the neck. [¶] Severe vomiting, [] coughing severely can cause the same kind of pressure. Some types of heart failure can cause pressure to build up in the lungs because the veins can't drain and they get stagnated and they build up the pressure and then [] blood vessels get injured and they start to die and they start to rupture and they cause these little dot-like hemorrhages."

Dr. Azar testified that Sango had injuries that "appeared to have been[] caused by someone else. She has multiple planes of injury to the head, to the left front of her scalp, big bruise. The right eyebrow, the lower eyelid. So I want to know from the investigator what happened. [¶] Was this woman in a car accident? Did she fall? You know, tumble, not just on one surface, but to explain these different areas. Also the neck injuries and the tongue bruise. Does she have a reason to have bit her tongue? Is she an epileptic? [I] need to know what happened to her. She can't tell me. I need someone else to tell me. And she had these scratches to her neck. Those are worrisome for an assault."

5

Based on the petechiae, the imprint of Sangco's tooth on her lip, and the bruise on her rib, together with the information she had been told, Dr. Azar concluded that the cause of death was asphyxiation due to smothering with manual strangulation. She determined that the manner of death was homicide. She testified that petechiae can be caused by severe chest trauma if it is strong enough to increase chest pressure enough to prevent blood from flowing back into the chest, but she did not believe the petechiae were caused by the medics' resuscitation efforts.

Dr. Azar also ordered toxicology tests of Sangco's blood. She testified that Sangco tested positive for methamphetamine and cocaine, but these results did not change Dr. Azar's opinion about the cause or manner or death. The results indicated a potentially toxic level of methamphetamine. Dr. Azar opined that it is possible the drug overdosage may have hastened Sangco's death while being asphyxiated, but Dr. Azar did not believe the drugs killed Sangco.

Dr. Azar testified that pressure on the neck can cause petechial hemorrhaging without causing death. On cross-examination, she agreed that if someone tries to strangle a person, and the person tries to fight and breathe, raising the person's chest pressure, that can cause petechiae without causing death.

Dr. John Hain, a retired forensic pathologist, testified for the prosecution. He reviewed the police reports, medical records, and the autopsy report, among other records. He opined that the cause of death was asphyxiation due to suffocation, strangulation, or both. From the autopsy photographs, he observed numerous petechiae under Sangco's eyelids and in the whites of her eyes. Such petechiae can result from strangulation as the build-up of blood in the head and the increase in blood pressure causes blood vessels to rupture. Dr. Hain based his opinion on the amount of petechiae, the tongue injury, and other injuries.

Dr. Hain testified that in strangulation cases, "because of pressure on the neck, there's often forcing—there's a forcing of the tongue, tip of the tongue, between the teeth

6

and with the upper—usually upward pressure on the jaw during strangulation, there are often bite mark hemorrhages or bruises within the tongue itself. And in this case the decedent exhibited all those findings. And it's a very characteristic constellation of findings that's seen that makes that conclusion fairly straightforward in this case." He agreed that a person can have petechiae even if they do not die from choking. He testified that chest compressions from resuscitation rarely cause as many petechiae as he observed in this case.

Dr. Hain did not detect any internal neck injuries, and he did not see any pressure marks or abrasions on Sangco's neck that would show she had been manually strangled. However, he had seen other cases of strangulation with no external markings on the neck.

Dr. Joseph Cohen testified for the defense as an expert in forensic pathology. He reviewed paramedic reports, emergency room reports, police reports, Sumagang's police interview, Dr. Azar's autopsy report, autopsy photos, and Sangco's toxicology report. Dr. Cohen disputed Dr. Azar's description of the "numerous petechial hemorrhages" on Sangco's face. Based on the autopsy photographs, Dr. Cohen testified that there were "maybe scattered petechial hemorrhages" and none were large. He testified that "the photographs do not really depict the extent of the petechial hemorrhages in comparison to Dr. Azar's description of those because she describes them as being numerous on the face and the eyes and the oral cavity and so forth." Dr. Cohen did not see numerous petechial hemorrhages on Sangco's face. In the photographs of her eyes, Dr. Cohen saw "maybe scattered petechial hemorrhages. I don't see any large ones. [¶] And on the face I see acne or folliculitis that seems to be pretty extensive. And so, you know, I'm a little hard pressed to kind of connect Dr. Azar's description with what the photographs show, and it may be that the photographs just aren't adequate or maybe for whatever reason they don't depict the petechial hemorrhages."

Dr. Cohen opined that the petechiae were consistent with the chest compressions that would have been applied as part of resuscitative measures or CPR by paramedics.

7

He had observed many cases in which neck compression, strangulation, or suffocation had caused petechial hemorrhaging but did not result in death. He added that chest compressions can cause petechial hemorrhages even if a person is already dead and cannot be revived. When asked if the efforts to resuscitate Sangco could have caused the petechiae in Sangco, Dr. Cohen responded, "[S]he did have some, you know, initial resuscitative efforts imposed on her by paramedics. She made it to the emergency room. They had defibrillator pads on. And they did a lot. They put in a breathing tube, intravenous lines. So through manipulation of the body, and even through intubation, putting the tube in, they bring the head back. So I don't want to put any inappropriate emphasis on that, but it's possible."

Dr. Cohen testified that head trauma did not cause or contribute to Sangco's death, and there were no life-threatening or lethal blunt-trauma injuries to her head. The absence of any internal neck injuries, as observed in Sangco, was atypical in strangulations. He explained, "in this case, with the absence of any internal neck injury—there's no soft-tissue injury inside the neck, front or back; there's no fracture of the hyoid bone, the U-shaped bone above the voice box; there's no hemorrhages in the strap muscles of the neck, either superficial or deep; there are no fractures of the cartilages of the neck, basically no injuries; everything I described by Dr. Azar's being entirely normal inside the neck—that is highly atypical in cases of strangulation."

Dr. Cohen opined that the drugs were a factor in Sangco's death. It is possible that Sangco survived the neck compression, developed petechial hemorrhages, and subsequently died from drug toxicity. He concluded that the cause of death was "not entirely clear." He disagreed with Dr. Azar's conclusion that it was asphyxia due to smothering through strangulation. He opined that the cause of death could have been drug toxicity with neck compression as a contributing factor. He testified that it was also possible Sangco died of a drug overdose five or 20 minutes after some degree of neck compression.

8

## D. Testimony from Sangco's Friends

Junelle Nuno was a close friend to both Sumagang and Sangco. She had seen Sumagang act violently toward Sangco on two occasions. At some point prior to 2014, she was sitting in a car parked next to their car outside a 7-Eleven when she saw Sumagang yelling at Sangco. Nuno then saw Sangco's face hit the window, and Sangco put her arms up in front her face to shield herself. On another occasion before that, Nuno saw Sumagang and Sangco arguing when he elbowed her in the face, causing Sangco to cover her face. Sumagang started crying and apologized.

A rift developed between Nuno and Sangco when Sangco began using heavy drugs like methamphetamine. Sangco talked about suicide a lot, and Nuno became afraid for her. Sangco threatened to commit suicide, but Nuno was unaware of any actual attempts. Sangco once threatened to commit suicide so that Sumagang would not leave her, and she burned a cigarette on her arm because he made her mad.

Marlen Luna was Sangco's friend, and she also knew Sumagang. Luna and her boyfriend frequently did drugs with Sumagang and Sangco, including methamphetamine and cocaine. Sangco told Luna that she (Sangco) had once gone to the hospital as a result of trying to kill herself. Once in 2014, Luna saw a cracked windshield in the car Sumagang and Sangco were in. Sumagang and Sangco had been mad at each other earlier. Sangco was throwing socks at Sumagang, and he threw a cup toward her but did not hit her. Luna never saw Sumagang physically abuse Sangco or put his hands on her.

## E. Testimony of Sangco's Psychiatrist

Dr. Renee Hill saw Sangco in the summer of 2013 after she was admitted to the hospital on an inpatient basis for severe depression. Sangco was "actively suicidal" and said she was "having wishes to die and was comfortable with just dying if that happened to her." Dr. Hill wrote in a report that Sangco was enticed with "[a]llowing herself to be killed," which Dr. Hill described as "passive suicidal thinking." Sangco also thought about using a gun to shoot herself or driving her car into a heavy object, but she told Dr.

Hill she had never attempted suicide. Sangco appeared more stable and hopeful after being released, but she stopped attending appointments by October 2013.

## II. DISCUSSION

### A. *Admission of the Postwarning Part of the Interview*

A detective interviewed Sumagang in two stages—before administering *Miranda*[2] warnings, and then again after warning him. Sumagang moved pretrial to exclude all statements he made during the entirety of the interview under *Miranda* and on the ground the statements were involuntary. The trial court held a hearing at which the detective, Terry Rahiri, testified about the circumstances of the interrogation as set forth below. The trial court excluded the prewarning portion of the interview but admitted the postwarning portion. Sumagang contends the trial court erred by denying his motion to exclude the postwarning portion.[3] The Attorney General contends the trial court properly admitted it because the interview was voluntary and the detective did not intentionally undermine the *Miranda* warnings. For the reasons below, we conclude the trial court erred by admitting the postwarning portion of the interview.

#### 1. *Circumstances Preceding the Interrogation*

Detective Terry Rahiri, the lead detective on the case, had been at the Monterey County Sheriff's office for 22 years. He testified that prior to the interrogation he had been briefed on the case by the deputy sheriff who was at the scene, but the cause of death had not yet been determined. Detective Rahiri said he did not have a "complete idea" and "there was a big piece of the puzzle missing."[4]

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3] Sumagang also contends his trial counsel was ineffective to the extent counsel may have failed to preserve this claim. The Attorney General concedes trial counsel preserved the issue, so we do not address the claim of ineffective assistance.

[4] The record includes a police report by Detective Rahiri attached as an exhibit to an earlier motion. In the report, Detective Rahiri stated he arrived at the scene of the crime and examined various pieces of evidence after other officers had taken Sumagang into custody. Another officer told Detective Rahiri that Sumagang had been found sitting

Prior to the interview, Sumagang was held in a safety cell at the county jail. When Detective Rahiri went to the jail, he asked the jail staff to bring out Sumagang so that the detective could determine whether Sumagang was sufficiently coherent to be questioned and whether he was willing to talk. Sumagang appeared able to answer questions accurately and said he was willing to go to the sheriff's office. Detective Rahiri had Sumagang transported to the Sheriff's office, where he was handcuffed and placed in an interview room.

### 2. *Detective Rahiri's Testimony at the Motion Hearing*

At the hearing for the motion to suppress, Detective Rahiri testified about the circumstances of the interrogation. Sumagang's emotions were "kind of up and down," and sometimes he would cry during the interview, but he appeared to understand the questions at all times. Detective Rahiri maintained a friendly tone and did not behave aggressively at any time during the interview.

Detective Rahiri testified that he knew Sumagang was in custody, and he confirmed that Sumagang was handcuffed, wearing jail clothes, and not free to leave. On cross-examination, defense counsel asked Detective Rahiri whether, as a seasoned officer, he knew that when a suspect in custody and about to be questioned about his involvement in a crime, Detective Rahiri was supposed to administer *Miranda* warnings. Detective Rahiri responded, "Yes."

Detective Rahiri admitted he "chose not to" warn Sumagang under *Miranda* because Detective Rahiri "wanted to see what he had to say first." But when defense counsel attempted to question Detective Rahiri specifically about his reasons for not

---

in the car with Sangco's head in his lap. Before interrogating Sumagang, Detective Rahiri questioned Sumagang's mother and father; obtained the father's consent to search the car; and obtained consent from the mother to search Sumagang's bedroom, where Detective Rahiri found medication with Sangco's name on it. Because this report was not part of the hearing on the motion to suppress, we do not include it in our analysis of this claim.

giving *Miranda* warnings at the start of the interrogation, the prosecution objected repeatedly. First, the prosecutor objected when defense counsel asked Detective Rahiri whether there was any reason not to give Sumagang *Miranda* warnings at the start of the interview. The trial court sustained the objection. Defense counsel then asked Detective Rahiri whether he knew that any incriminating prewarning statements Sumagang made could be used against him for impeachment purposes. The prosecutor objected on the ground that "[t]his goes to the officer, not the defendant." The trial court sustained the objection. Defense counsel then asked Detective Rahiri whether his purpose for not reading *Miranda* warnings was to obtain statements that could be used for impeachment. Again, the prosecutor objected, and the trial court sustained the objection. Defense counsel then asked Detective Rahiri whether he was aware of the legal rule allowing for the use of prewarning statements for impeachment. Again, the prosecutor objected, and the trial court sustained the objection. Defense counsel then asked Detective Rahiri, "So what was your purpose, then, of not reading him his *Miranda* rights at this critical moment?" The prosecutor objected on relevance grounds, and the trial court sustained the objection. Finally, when defense counsel asked Detective Rahiri whether he knew "that by asking [Sumagang] questions before *Miranda* that you were violating his *Miranda* rights," Detective Rahiri responded, "Not at that time, but later on I did."[5] Detective Rahiri added that he did not come to this realization until "way after the interview" after talking with counsel and thinking about the case.

### 3. *Prewarning Portion of the Interrogation*

At the start of the prewarning portion of the interview, Detective Rahiri told Sumagang that "if at any time you don't feel like talking, or you wanna leave, just let me know [. . .] and we'll end our little discussion. [. . .] [I]f you wanna leave, you know, we'll take you back if you don't feel comfortable talkin' to me. That's fine. That's up to

---

[5] The prosecutor objected to this question as well, but the trial court overruled the objection.

you. So this is totally voluntary. You understand?" Sumagang nodded slightly in response. Detective Rahiri asked Sumagang about various personal facts, including his full name, date of birth, driver's license number, place of residence, employment, and other personal information.

Detective Rahiri then questioned Sumagang about the nature of his relationships with Sangco and their friends, and the detective elicited a narrative of the events of the night when Sangco died. After about 18 minutes, the subject of the questioning turned to the circumstances immediately preceding Sangco's death. Sumagang stated that, after the couple drank tequila and swallowed pills, Sangco asked him, "Can you please choke me out in the back seat please?" He expressly admitted he did so, and he described in detail how and where the two were positioned in the car; how long it lasted; what she said while being choked; how her body reacted; and how she stopped breathing after one or two minutes. Sumagang also explained how he tried to cut his own wrist with a small knife and attempted but failed to set the car on fire. Finally, Detective Rahiri asked Sumagang about several pieces of evidence that had been found in and around the car.

The prewarning part of the interview lasted 25 minutes, followed by a two-minute break. Upon returning from the break, Detective Rahiri administered *Miranda* warnings and continued the interview for another 45 minutes. After warning Sumagang, Detective Rahiri questioned him in narrative fashion about the events leading up to Sangco's death. Detective Rahiri asked about many of the same topics they had covered in the prewarning part of the interview. Detective Rahiri again asked Sumagang to explain how he killed Sangco, what she said when he did so, and how her body reacted as she appeared to go lifeless.

### 4. *The Trial Court's Ruling on the Motion to Exclude*

The trial court found the confession was not coerced or involuntary. The court ruled that the prewarning part of the interview was inadmissible except for impeachment purposes. As to the postwarning part of the interview, the court ruled it admissible in the

13

prosecution's case in chief.  The court found Detective Rahiri's testimony to be credible and found "it appears that Detective Rahiri didn't understand even that he needed to give the *Miranda* rights initially."  The court added, "I don't think he was intentionally trying to do anything like that," and noted that Detective Rahiri's manner remained calm and soft-spoken throughout the interview, consistent with his appearance on the stand.  The court further found there was no "softening up" that would have caused Sumagang to confess.

When Sumagang later moved for a mistrial based on the admission of the postwarning statement, the trial court denied the motion.  The court relied on Justice Kennedy's concurring opinion in *Seibert* in ruling again that the postwarning statement was admissible.  The court again found that Detective Rahiri did not understand that he needed to give *Miranda* warnings at the start of the interview, and the court found no deliberate violation of *Miranda*.  The court further reiterated its finding that the statement was made voluntarily.

After the jury rendered its verdict, Sumagang moved for a new trial based on erroneous admission of statements under *Miranda*.  The trial court denied the motion on the same grounds previously set forth.

### 5.  *Legal Principles*

In a custodial interrogation, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."  (*Miranda*, *supra*, 384 U.S. at p. 467.)  "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."  (*Seibert*, *supra*, 542 U.S. at p. 608.)  "In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them."  (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.)

14

We review independently the trial court's legal determinations of whether a *Miranda* waiver was knowing, intelligent, and voluntary. (*People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*).) We review the trial court's factual findings regarding the circumstances surrounding the interrogation and waiver under a substantial evidence standard. (*Ibid.*) The prosecution bears the burden of proof and must show by a preponderance of the evidence the statements were, in fact, voluntary. (*Ibid.*)

### 6. *Admission of the Postwarning Statements Was Error*

The Attorney General does not dispute that the interview was custodial for the purposes of the *Miranda* analysis. Sumagang contends the postwarning portion of the interview should have been excluded under *Seibert*, but that even if it was not excludable under *Seibert*, it should have been excluded as involuntary. The Attorney General contends the postwarning portion of the interview was admissible under *Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*).

In *Elstad*, the police went to a suspect's house to arrest him for burglary. The suspect, who had not been warned under *Miranda*, voluntarily acknowledged he had been at the scene of the burglary. Later, at the start of a systematic, detailed interrogation at the police station, the suspect was warned under *Miranda*, waived his rights, and made a full confession. (*Elstad*, *supra*, 470 U.S. at pp. 300-302.) The high court rejected the argument that the later, postwarning confession was tainted by the earlier statement, and the court held the confession was admissible because it was knowingly and voluntarily made. (*Id.* at p. 309.)

Following *Elstad*, in *Seibert* the United States Supreme Court considered a "two-step" interrogation in which the police deliberately questioned the defendant without warning her, issued *Miranda* warnings, and then continued the interrogation. (*Seibert*, *supra*, 542 U.S. at pp. 604-606.) Seibert feared charges of neglect arising from the death of her son, who suffered from cerebral palsy. In Seibert's presence, two of her sons and some friends devised a plan to cover up the death by setting fire to the family's

15

mobile home, which also housed a mentally ill teenager. The fire killed the teenager. Police took Seibert into custody and intentionally questioned her for 30 to 40 minutes before giving her *Miranda* warnings. After she admitted the fire was intended to kill the teenager, police gave her a 20-minute break, administered the *Miranda* warnings, and reinitiated the questioning, whereupon she repeated the incriminating statements. The questioning officer admitted he made a conscious decision based on his training to withhold *Miranda* warnings until Seibert confessed. (*Id.* at p. 606.) The trial court granted a motion to suppress the prewarning statements but admitted the postwarning statements. Seibert was then convicted of second degree murder. The Supreme Court held that such postwarning statements are inadmissible under certain circumstances as set forth below.

This case is distinguishable from *Elstad* and much closer to *Seibert*. Elstad made his postwarning confession in an entirely different interview at the police station, long after his brief prewarning statement at home. Here, as in *Seibert*, the prewarned statement was given at the sheriff's office, in response to questioning that was "systematic, exhaustive, and managed with psychological skill." (*Seibert*, *supra*, 542 U.S. at p. 616.) And as in *Seibert*, "there was little, if anything, of incriminating potential left unsaid" after Sumagang gave his prewarning confession. (*Ibid.*) In *Elstad*, by contrast, the defendant merely admitted in his prewarning statement that he had heard about the burglary and was at the scene of the crime. Finally, there was nothing in *Elstad* to suggest the police made a conscious choice to withhold *Miranda* warnings before questioning the suspect in custody. Here, Detective Rahiri acknowledged that he knew *Miranda* warnings are required when questioning a person who is in custody about their involvement in a crime and he admitted he *chose not to warn* Sumagang because he wanted to hear what Sumagang would say first. We conclude that *Seibert* controls the analysis here.

16

Although a majority of the high court in *Seibert* held that postwarning statements are inadmissible under certain circumstances, the court was fractured with respect to what circumstances are required or what the test should be. A plurality held that the "threshold issue" is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." (*Seibert*, *supra*, 542 U.S. at pp. 611-612 (plur. opn. of Souter, J.).) The plurality set forth several objective circumstances that bear on this determination, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Id.* at p. 615.)

Justice Kennedy concurred in the judgment but proposed a different test based primarily on the interrogator's intent. In his view, the postwarning portion of the interrogation would be inadmissible only if "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) While Justice Kennedy did not explain how such a test would be applied, he noted that the interrogating officer in *Seibert* "relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them." (*Id.* at p. 621.) Furthermore, Justice Kennedy added that "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." (*Ibid.*)

The California Supreme Court has declined to decide whether the *Seibert* plurality's rule or Justice Kennedy's rule should be applied. (*Krebs*, *supra*, 8 Cal.5th at p. 309.) The Attorney General contends Justice Kennedy's concurring opinion represents

17

the holding of the court because it provides the narrowest grounds for supporting the judgment. (See *Marks v. United States* (1977) 430 U.S. 188, 193 [when a fragmented court decides a case and no single rationale is supported by five or more justices, the holding of the court may be viewed as that position taken by the members who concurred in the judgment on the narrowest grounds]; *People v. Camino* (2010) 188 Cal.App.4th 1359 (*Camino*).)

We will assume, without deciding, that Justice Kennedy's concurrence controls the analysis. Accordingly, we consider whether the record shows the two-step tactic was employed to deliberately circumvent *Miranda*. Our analysis of this question, however, is informed by the objective circumstances of the interrogation, including the various factors set forth in the *Seibert* plurality opinion. "[A] trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights." (*U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157 (*Williams*) [confession must be suppressed where law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's position of his rights].)

The trial court credited the detective's testimony that he did not believe he was violating Sumagang's *Miranda* rights by not giving the warnings at the start of the interrogation. "The trial court had the opportunity to view [the detective's] demeanor and therefore was in the best position to assess the credibility of" his testimony; we accept that assessment. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 78.) But, regardless of any good faith mistake at the outset of the interview, at some point Detective Rahiri determined that he needed to give *Miranda* warnings. The question for this court is whether the government proved by a preponderance of the evidence that, after coming to that realization, the detective "did not deliberately withhold the requisite

18

warnings as part of a calculated strategy to foil *Miranda*." (*United States v. Guillen* (10th Cir. 2021) 995 F.3d 1095, 1121 (*Guillen*).)

The Attorney General has not carried that burden. Because the prosecutor objected to defense counsel's questions of the detective about his reasoning with respect to *Miranda*, the record lacks evidence of the detective's subjective mental processes. "But deliberateness may also be inferred from objective indications of subjective intent to frustrate Miranda." (*Guillen, supra*, 995 F.3d at p. 1121.) Here, the evidence supports an inference of deliberateness. First, like the officer in *Seibert*, Detective Rahiri "relied on the defendant's prewarning statement to obtain the postwarning statement" in a fashion that "resembled a cross-examination." (*Seibert*, supra, 542 U.S. at p. 621 (conc. opn. of Kennedy, J.).) In the postwarning part of the interview, for example, Detective Rahiri asked leading questions that incorporated incriminating statements Sumagang had only made prewarning. Most significantly, Sumagang made no statements in the postwarning interview about choking or strangling Sangco until Detective Rahiri told him to "explain the head-butting" and asked, "*Is that before you had hands on?*" (Italics added.) When Sumagang responded that he head-butted her "at the same time as hands on," Detective Rahiri pressed him to explain, and told him, "So you end up straddling her." When Sumagang failed to respond, Detective Rahiri added, "She's face up." When Sumagang failed to describe how Sangco was positioned, Detective Rahiri continued to inject facts elicited in the prewarning part of the interview, telling Sumagang, "And then *you're on top, hands on*. And how did her body feel?" As Justice Kennedy observed, "Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating." (*Ibid.*) (Compare with *Krebs, supra*, 8 Cal.5th at p. 311 [police did not use defendant's prewarning statement to induce him to talk after warning him].)

Furthermore, the police did not use any of the "curative measures" suggested by Justice Kennedy's concurrence. (*Seibert, supra*, 542 U.S. at p. 622 (conc. opn. of

19

Kennedy, J.).) There was no substantial break in time or circumstances between the two parts of the interrogation, nor any other circumstance that would have "allow[ed] the accused to distinguish the two contexts and appreciate that the interrogation ha[d] taken a new turn." (*Ibid.*) Apart from the *Miranda* warnings, Detective Rahiri gave no other admonishments at the start of the postwarning interview, and Detective Rahiri said nothing that would have informed Sumagang his prior statement still could not be used against him even if he chose to remain silent at that point. The fact that "[n]o curative steps were taken," weighs in favor of exclusion under Justice Kennedy's concurrence. (*Ibid.*) Finally, we note that, as in Justice Kennedy's concurrence, the use of a two-step interrogation here, whether deliberate or otherwise, did not serve any legitimate purpose.

Our analysis is informed by the objective factors set forth in the *Seibert* plurality opinion. (See *Williams, supra,* 435 F.3d at pp. 1157-1158 [in determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning].) The first factor—the completeness and detail of the questions and answers in the prewarning interview—weighs in favor of exclusion. Over the course of the 25-minute interview, Detective Rahiri elicited a detailed narrative of the night that Sangco died, including all the facts needed to inculpate Sumagang. Sumagang stated that after the couple drank tequila and swallowed pills, Sangco asked him, "Can you please choke me out in the back seat please?" He expressly admitted he did so, and he described in detail how and where the two were positioned in the car; how long it lasted; what she said while being choked; how her body reacted; and how she stopped breathing after one or two minutes. The prewarning statement thereby provided detailed evidence about the nature of the offense.

The second factor—the overlapping content of the two statements—also weighs in favor of exclusion. As set forth above in section I.B.3., Detective Rahiri elicited the same

20

basic narrative of the night's events in the postwarning interview, and Sumagang confessed again that Sangco asked him to kill her. Similar to his statement in the prewarning portion of the interview, Sumagang admitted in the postwarning portion that "I gave it to her" and he admitted he had his "hands on" her, whereupon her eyes started shuttering, her arms started going limp, and her body stopped moving.

The remaining factors—the timing and setting of the first and the second parts, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first—further weigh in favor of exclusion. The setting consisted of the same room for both parts of the interview, the same interrogator conducted both parts, and the postwarning questioning started two minutes after the prewarning portion of what amounted to a continuous interaction between the detective and the suspect. Detective Rahiri began the prewarning part of the interview by gathering various facts about Sumagang's personal background, but when he returned for the postwarning part, he directed the questioning to the events of the fatal evening. Detective Rahiri then questioned Sumagang about the same critical facts of the choking. As in *Seibert*, "The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." (*Seibert*, *supra*, 542 U.S. at p. 616.)

Viewing these factors together with Detective Rahiri's testimony, and considering the overall setting and context of the interrogation, we conclude the detective deliberately undermined *Miranda* by employing the two-step interrogation tactic. Even considering the *Seibert* plurality's test by itself, however, it would not be reasonable to find the *Miranda* warnings objectively functioned effectively as required. A reasonable person in Sumagang's position at the start of the postwarning interview would not have thought he had "a real choice about giving an admissible statement at that juncture" or that he could "choose to stop talking even if he had talked earlier." (*Seibert*, *supra*, 542 U.S. at pp. 611-612.) There was no "practical justification for treating the second stage of

21

interrogation as distinct from the first, unwarned and inadmissible segment." (*Id.* at p. 612.) We therefore conclude the two-stage interrogation violated the standards set forth in both Justice Kennedy's concurrence in *Seibert* as well as the *Seibert* plurality's opinion.

The interrogation in this case is distinguishable from the questioning considered by the California Supreme Court in *Krebs*, *supra*, 8 Cal.5th 265. Krebs was convicted of two first degree murders, forcible rape, sodomy, kidnapping, and other offenses. (*Id.* at pp. 273-274.) He was on parole at the time of the offenses, and he was taken into custody for a parole violation before police had connected him to the murders. While he was in custody, police questioned him several times about whether he was involved with the murders, but he initially denied it. He was one of 13 to 16 persons being questioned by the police for the killings. (*Id.* at p. 295.) Police did not initially administer *Miranda* warnings, but Krebs was warned prior to the second interview. At the start of the fourth such interview, before the officer administered *Miranda* warnings, Krebs told the officer, " 'I'm nothing but an animal. I don't deserve to live' and 'Nothing can justify what I did.' " (*Id.* at p. 298.) After the interrogating officer administered *Miranda* warnings, Krebs confessed to the killings in detail. (*Id.* at pp. 294-295.) The trial court excluded the statements made before the warnings but admitted the confession.

The Supreme Court held the postwarning statements were properly admitted under either the plurality's approach in *Seibert* or Justice Kennedy's concurrence. (*Krebs*, *supra*, 8 Cal.5th at pp. 309-312.) Applying the plurality's test, the court noted there was no extended questioning before the *Miranda* warnings; the defendant's prewarning responses were vague and nonspecific; and there was a change of setting before he made the confession. Moreover, prior to the confession, the questioning officer administered the *Miranda* warnings in a detailed way that informed defendant he had a "real choice" whether to follow up on his earlier statements. Applying Justice Kennedy's test, the court concluded the questioning officer did not deliberately undermine the *Miranda*

22

warnings. Most significantly, the court noted that the officer administered the *Miranda* warnings *before* Krebs confessed. (*Id.* at p. 311.) The court also credited the officer's testimony that Krebs was not in custody for the killings.

All of these factors distinguish *Krebs* from this case. Here, the officer did not warn Sumagang until *after* he confessed in great detail. Second, there was no doubt Sumagang was in custody for the death of Sangco, and not for any other reason. Third, there was no change of setting before the prewarning and postwarning portions of the interview. Fourth, Sumagang was not given *Miranda* warnings at any time prior to his prewarning interview.

The Attorney General argues that Sumagang was not under arrest at the time of the interrogation and that Detective Rahiri did not yet consider Sumagang to be a suspect in the crime. The record does not support the Attorney General's contention. Detective Rahiri, who was the lead detective on the case, was aware of the evidence found at the scene of the crime, and he was told by another detective that Sumagang was found with Sangco's body in his lap. Then, throughout the postwarning interview, he confronted Sumagang with photographs of the evidence and questioned him about the various pieces of evidence, including injuries to Sangco's body. There were no other suspects at the scene of the crime—only Sumagang, who was discovered with Sangco lying in his lap. At no point did Detective Rahiri identify any other person he would have considered to be a suspect. And there is no dispute that Sumagang was in custody for the offense; whether he was formally "under arrest" or not, it was abundantly clear that *Miranda* warnings were required.

The Attorney General relies on *Camino*, *supra*, 188 Cal.App.4th 1359. *Camino* concerned the interrogation of a former gang member who was involved in a fatal shooting during a shoot-out with a rival gang. (*Camino*, at pp. 1364-1367.) Camino was not the shooter. Rather, the victim of the shooting was Camino's fellow gang member, who was shot after Camino and another person chased down members of the rival gang.

23

The prosecution later charged Camino under the "provocative act" doctrine. Under this doctrine, a defendant may be charged in the death of an accomplice if the defendant commits a provocative act that provokes a third party into killing the accomplice.

After the shooting, the police interviewed Camino twice—first without *Miranda* warnings, during which Camino gave a detailed account of the shooting—and then again 30 minutes later after issuing the warnings, after which the interview covered the same basic facts. At an evidentiary hearing on the defendant's motion to suppress, the questioning officer testified that his department did not have a policy of administering these two-step interrogations, and he asserted he did not intentionally withhold *Miranda* warnings to obtain inculpatory statements in the first part of the interview. (*Camino*, *supra*, 188 Cal.App.4th at p. 1374.) The officer testified that he did not know whether Camino was a witness, victim, or suspect in the case before initiating the first part of the interview. During the prewarning part of the interview, the officer realized that Camino might have some criminal culpability, whereupon the officer stopped the interview and administered the *Miranda* warnings before interviewing Camino again. The trial court ruled that the postwarning part of the interview was admissible because the officer did not deliberately use a two-step process to circumvent *Miranda*.

The Court of Appeal in *Camino* affirmed the conviction. (*Camino*, *supra*, 188 Cal.App.4th at p. 1382.) The court held substantial evidence supported the trial court's finding that the officer did not deliberately use a two-step process. (*Id.* at p. 1376.) The court noted that at the start of Camino's interview, the police did not know the circumstances of the shooting, and they did not know whether Camino was even present when the victim was shot. Relying on Justice Kennedy's concurrence in *Seibert*, the court concluded the postwarning portion of the interview was admissible. The *Camino* court held that Justice Kennedy's concurrence represented the holding of *Seibert* under the *Marks* rule. (*Id.* at p. 1370.)

This case is distinguishable from *Camino*, in which the defendant's involvement in the shooting was more peripheral, and the police had a credible explanation for why they did not know if Camino was present at the shooting when they began the interview. (*Camino*, *supra*, 188 Cal.App.4th at pp. 1374-1375.)  Here, Sumagang was the sole suspect in Sangco's death, and the police had abundant evidence of his involvement.

For the reasons above, we conclude the trial court erred by admitting Sumagang's postwarning statements under *Miranda* and *Seibert*.  Admission of the statements constituted a violation of the Fifth and Fourteenth Amendments.

### 7.  *Admission of the Postwarning Statement Prejudiced Sumagang*

The Attorney General bears the burden of showing that admission of the postwarning confession was harmless beyond a reasonable doubt.  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296 (*Fulminante*), citing *Chapman v. California* (1967) 386 U.S. 18.)  " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.]  "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.]  Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

With respect to the erroneous admission of a confession, the burden under the *Chapman* standard is difficult to satisfy.  "The defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .  [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have

25

profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." (*Fulminante*, *supra*, 499 U.S. at p. 296.)

The Attorney General argues that even apart from the confession, strong evidence showed Sumagang killed Sangco with premeditation and deliberation. The Attorney General points to Sumagang's statements at the scene of the crime; the testimony of the prosecution's forensic pathologists; and the physical evidence found in and around the car.

First, as to Sumagang's own statements at the scene of the crime, they were vague and incomplete. He was crying, and according to police, he told them "he was not supposed to be there" and was "supposed to be with the female." He said he and Sangco had both "taken a bunch of Klonopin and drank as much tequila as they could." One police officer testified that Sumagang "mentioned that he did this to her," and another officer testified that when he asked Sumagang how Sangco received injuries to her face, Sumagang replied, "I did that to her." These statements showed that Sumagang injured Sangco, but not that he killed her in a premeditated fashion.

The forensic pathologists who testified for the prosecution opined that Sangco had been choked or strangled to death, but Sumagang's expert witness disputed their conclusions. Both sides' experts agreed there were no internal injuries in Sangco's neck. The toxicology report showed Sangco had a potentially toxic level of methamphetamine in her blood, as well as cocaine. The prosecution's witnesses relied primarily on the presence of petechiae on Sangco's face, but Sumagang's expert testified that the petechiae were scattered and none were large. Sumagang's expert testified that Sangco could have died from a drug overdose and opined that any petechiae could have been caused by chest compressions during CPR or as the result of a non-fatal choking attempt. A reasonable jury could have credited that testimony. The Attorney General offers nothing to show beyond a reasonable doubt that the jury relied on the prosecution's experts rather than Sumagang's confession to conclude he killed her.

Even if the jury credited the prosecution's experts in finding Sangco died of choking or strangulation, the evidence did not establish beyond a reasonable doubt that Sumagang intentionally killed Sangco *with premeditation*. The Attorney General points to physical evidence showing that the car had been set on fire, but absent Sumagang's confession, there was no other evidence he set the fires instead of Sangco or someone else. The Attorney General points to the injuries on Sangco's face and Sumagang's own face, but both sides' experts agreed that Sangco did not die from those injuries.

Absent Sumagang's confession, the remaining evidence was not so overwhelming that it would have resulted in a guilty verdict of first degree murder beyond a reasonable doubt. To the contrary, it is reasonably likely the jury relied at least in part on Sumagang's confession in finding he intentionally killed Sangco with premeditation. Accordingly, we must reverse the judgment of conviction.

## B. *Other Claims*

Sumagang raised several other claims in this appeal. He contends the trial court erred by admitting his postwarning statements regardless of whether it was admissible under *Seibert* because his confession was involuntary. Second, he contends the court erred by failing to instruct the jury on voluntary intoxication. Third, he argues the cumulative effects of those errors requires reversal. Finally, he contends we should conditionally reverse the judgment and remand for a mental health diversion eligibility hearing under Penal Code section 1001.36. Because we are reversing the judgment of conviction, we do not reach these additional claims.

## III.    DISPOSITION

The judgment is reversed.

_____
Greenwood, P. J.

WE CONCUR:


_____
Elia, J.


_____
Danner, J.


People v. Sumagang
No. H044023

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No.: SS143024 |
| Trial Judge: | The Honorable Carrie McIntyre Panetta |
| Attorney for Defendant and Appellant<br>Byron Silim Sumagang: | Patrick McKenna<br>under appointment by the Court<br>of Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>The People: | Rob Bonta,<br>Attorney General of California |
| | Gerald A. Engler<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence<br>Senior Assistant Attorney General |
| | Donna M. Provenzano<br>Supervising Deputy Attorney General |
| | Victoria Ratnikova<br>Deputy Attorney General |

People v. Sumagang
H044023